**COASTLAND CONSTRUCTION, INC. Plaintiff,**

v.

**F.O.M. PUERTO RICO, S.E. Defendants.**

**No. CIV. 01–1919(HL).**

United States District Court, D. Puerto Rico.

Aug. 14, 2002.

Ramon L. Vinas-Bueso, Manuel A. Guzman Law Office, San Juan, PR, for Plaintiff.

Ruben T. Nigaglioni, McConnell Valdes, San Juan, PR, Michael I. Less, Clifton M. Lipman, John D. Willet, Less, Getz & Lipman, Memphis, TN, for Defendant.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

Plaintiff, Costland Construction, Inc. ("Coastland") brings this claim against Defendant F.O.M. Puerto Rico, S.E. ("F.O.M.") for breach of contract. The parties executed a contract to perform interior work and services during the construction of the Belz Factory Outlet Mall of Canóvanas, Puerto Rico. Defendant terminated the contract for convenience and

1. Although Plaintiff originally claimed damages in the amount of $1,413,163.43 (See Docket no. 1), and then revised the figure to $1,427,098.39 (See Docket no. 64), this last figure of $1,299,657.76 includes the deduction of payments to subcontractors for the work performed.

did not approve or pay Plaintiff's final pay application. Plaintiff seeks payment of $1,299,657.76 [1] for the work allegedly in place as of the date of termination, cancellation charges, contractual damages, plus interest and attorney's fees. While Defendant contends that Plaintiff is entitled to no more than $408,385.52 for the work it performed on the project, it also maintains that Plaintiff is barred from full or partial recovery by the equitable doctrine of unclean hands. The Court held a five-day bench trial on this matter. The parties have submitted their post-trial briefs, and the Court is now ready to rule.

## FINDINGS OF FACT

Based on all the evidence and testimony presented at trial, as well as the parties' stipulations in the pretrial order, the Court makes the following findings of fact:

1. The Canóvanas Belz Factory Outlet Mall is owned by the Defendant·F.O.M., a partnership formed under the laws of the Commonwealth of Puerto Rico. Coastland and F.O.M. entered into a contract on August 28, 2000, entitled "Phase D–Tenant Vanilla Box Fit–Out Construction Work Contract" ("the Contract") which provided for the interior construction work at the mall for the lump sum price of $6,160,527.[2]

2. Coastland's Contract with F.O.M. was divided into two phases. Phase I covered the interior storefronts for the individual stores and the demising wall stud framing in the mall. Phase II covered the construction of the interior "vanilla boxes" (i.e., the walls, ceilings, mechanical, and electrical) for the individual stores.[3]

2. Docket no. 50; docket no. 62; Joint Exhibit VI.

3. Docket no. 50.

3. The Contract was a Unit Price Contract, where Coastland was paid for units installed.[4] The Contract states that unit prices are binding for the life of the Contract and include installation, labor, burden, import taxes, insurance, material costs, freight and/or delivery charges, and equipment costs. In addition to the unit prices, the Contract contained separate line items for markup, general conditions and allowances.[5]

4. All work and other obligations performed under the Contract were paid on a monthly basis as installed. General conditions were pro-rated on a monthly basis.[6] Modifications to the scope of work and items unresolved at the time of execution of the Contract were tracked as change orders.[7]

5. The Contract was negotiated between Jay Dorsey, the Project Manager of the Belz Project for Coastland, and Kevin McCray of Tri–Tech Management Services ("Tri–Tech"), a New York construction management firm that acted as Program Manager for the construction of the mall.[8]

6. On February 22, 2001, Defendant announced that Belz Construction would be acting as its representative on site "in connection with all work associated with landlord's vanilla box work, as well as any work that needs to be done above the vanilla box that would be paid for by the tenants." Errol Flynn, Belz Construction's Vice–President, was asked by Andrew Groveman, F.O.M.'s Vice–President, to look at the Contract and give his opinion about the pricing structure.[9]

7. After reviewing the Contract, Flynn complained and questioned the unit prices being charged by Coastland.[10]

8. F.O.M. terminated Tri–Tech, the Contract Project Manager, on March 15, 2001.[11]

9. On March 30, 2001 in response to Flynn's complaint, the parties modified the Contract by issuing deductive Change Order Number 10.[12] Under this modification, Phase I would stay at unit cost while Phase II would be separately quoted in lump sums by stores. At this point Coastland had completed work in Phase II under the unit price structure. Coastland continued this Phase II work and if it was awarded the store as a lump sum contract, all the work would be rolled into the lump sum. If Coastland was not awarded the store as a lump sum, the work in place would be evaluated, and paid under the unit price structure.[13]

---

4. A unit-price contract is one wherein the contractor submits a price per unit (the cement work, for example, may be a unit) for each of the various categories involved.

5. Docket no. 50.

6. General conditions costs typically refer to a contractor's job overhead and may be characterized as an allowance related to the cost incurred by the contractor for the work. Examples of such include a job vehicle, temporary toilets, and a storage trailer.

7. Joint Exhibit VI. Almost all construction contracts contain a clause allowing the owner to issue written changes to the work requirements or conditions in the contract without being in breach of the contract. The clause allows the owner to order desired changes within the general scope of work, to address unforeseen circumstances or field problems. *Construction Litigation*, American Bar Association (2001).

8. Testimony of Jay Dorsey.

9. Testimony of Flynn; Defendant's Exhibit E3.

10. Testimony of Dorsey.

11. Testimony of Flynn.

12. A deductive change order is a change order that reduces the scope of work and the contract price.

13. Testimony of Dorsey.

10. F.O.M. requested quotes, and the parties were able to reach mutually agreeable lump sum amounts for all of the Vanilla Box work in eleven stores.[14]

11. Five of the Phase II stores for which the parties agreed on a lump sum price were completed by Plaintiff.[15] The remaining six of the Phase II stores for which the parties agreed on a lump sum price were not completed by Plaintiff.[16]

12. The Phase II work performed on stores other than those for which lump sum prices were agreed and change orders were issued were properly billed using the unit price structure in place prior to deductive Change Order no. 10.[17]

13. F.O.M. terminated Coastland's contract for convenience on May 31, 2001. The contract permitted the termination and provided the manner in which Coastland would be compensated.[18]

14. The Defendant made previous payments to Coastland in the amount of $2,371,066.53. Defendant has paid a total of $427,305.04 directly to Coastland's subcontractors.[19]

15. The value of the stored materials which remained on the project upon Coastland's termination is $116,393.06.[20]

16. Coastland completed 95% of the Phase I work for which it billed F.O.M. in Phase I.

17. Coastland did not complete all the work for which it billed F.O.M. in Phase II.

18. Coastland did not supply the Belz project with all the general conditions provided under the Contract.

---

14. Docket no. 50; testimony of Dorsey.

15. Testimony of Dorsey.

16. Testimony of Flynn.

17. Testimony of Dorsey.

## DISCUSSION

### 1. The Phase D–Tenant Vanilla Box Fit–Out Construction Work Contract

The parties do not dispute the existence of a valid, enforceable contract. When the language of a contract is clear, it is not the function of the Courts to interpret the contract, but rather to give full effect to it as written. *Vulcan Tools of Puerto Rico v. Makita, U.S.A., Inc.,* 23 F.3d 564, 564–68 (1st Cir.1994). An agreement is clear when it can be understood in one sense alone, without leaving any room for doubt, controversies or differences of interpretation. *Adria Intern. Group, Inc. v. Ferre Development,* 241 F.3d 103, 109 (1st Cir. 2001).

Pursuant to Coastland and F.O.M's Contract, Coastland was to construct all storefronts and demising walls within the Belz Mall (Phase I), and the vanilla box and tenant fit-out construction (Phase II). Coastland started working on the project on September 5, 2000, and was scheduled to complete the project in 253 calendar days for a lump sum price of $6,160,527.

The Contract states that it "constitutes the entire agreement between the owner and Contractor and supercedes all prior written or oral agreements, understandings, representations, negotiations and correspondence ... shall not be supplemented, amended or modified by any course of dealing, course of performance or usage of trade... [and] may only be amended or modified by a written instrument duly executed by officers of both parties." [21] The contract also provides that "[n]o oral agreement or conversation with any offi-

---

18. Docket 50.

19. Docket no. 50; Testimony of Flynn.

20. Defendant's Exhibit L–5.

21. Joint Exhibit VI, Section 26.09.

cer, agent or employee of the Owner or its representatives, either before or after execution of this Agreement shall affect or modify any of the terms or obligations contained in this Agreement or the Contract Documents." [22] The Contract states that it "shall be governed by and construed according to the Laws of the Commonwealth of Puerto Rico." [23]

Without invalidating the Contract, F.O.M. could make changes by altering, adding, or deducting from the work by executing a change order. According to the Contract's change order procedure, "Upon receipt of a request from the Owner for extra Work or changes in the Work, the Contractor shall furnish to the Owner a statement setting forth in detail the proposal of the Contractor for performing the extra Work or changes." [24]

The two primary contractual disputes between Coastland and F.O.M. involve the Contract's unit price structure and the interpretation of Change Order No. 10 which modified Phase II of the Contract.

### A. Unit Price Structure

■ The Contract is structured as a Unit Price Contract with a not to exceed maximum value of $6,160,527. Coastland would be paid for the quantity of units installed for the products defined in the unit price breakdown. The Contract's "Vanilla Box Cost Estimate" ("the Estimate") breaks the Contract price down by general conditions, allowances, and specific construction activities (e.g., concrete, electrical, storefronts). Each item in the construction activities was assigned a unit cost. After the subtotal for these unit cost items there is a separate line item for ten percent (10%) markup. Hence, the total

Contract price includes, general conditions, allowances, the subtotal for the unit cost items, and a 10% markup on the subtotal for the unit cost items.

To assign a value for each unit, Tri–Tech provided Coastland with the quantities of units that would be needed for the project. Coastland then estimated how much each would cost and filled in the price for each unit. A note in the Estimate provides, "Breakdown unit prices in table above are to include installation, labor, burden, taxes, insurance, material costs, freight and/or delivery charges, sales taxes and equipment costs." [25] Although this note does not state that the unit prices include markup, it does not provide that the unit prices are *only* to include the listed items. The unit costs Coastland quoted were the best estimates it could provide at the time the parties signed the Contract. At the time, Coastland did not have all the subcontractor quotes. Hence, when Coastland signed off on these prices, it was assuming the risk that the subcontractors may have charged Coastland more than it had estimated. Elucidating on this risk, Dorsey testified at trial: "I'm agreeing to a set value for that price. If I cannot get a contractor or a vendor to execute the work for that set value, and I have to pay more for that unit than I'm being compensated by the owner, then Coastland would have to absorb whatever the difference were."

When Coastland put the estimate together, it did not know what markup it had other than the ten percent (10%) markup line item.[26] Dorsey testified that at the time Coastland provided Tri–Tech with the "Vanilla Box Cost Estimate" the numbers they provided for the unit costs were only estimates. As such, Coastland did not

22. Joint Exhibit VI, Section 10.03.

23. Joint Exhibit VI, Section 26.03

24. Joint Exhibit VI, Section 9.02.

25. Joint Exhibit VI.

26. Testimony of Dorsey.

know whether it would realize any profit on these units: "At the end of the job if no other contingencies are needed or no other missing items are found, then [the difference between the unit price and what the subcontractors were charging Coastland] could be recognized as profit. If I have costs incurred for items that weren't taken into account, then, no, it wouldn't be profit."[27]

Defendant submits that the prices that appear in the unit price breakdown were to include only direct and actual costs to Coastland plus a 10% markup that would account for profit.[28] Rather than reading the markup line as a separate line item in addition to the established unit prices, Defendant interprets this line as excluding any markup or profits over 10% from the unit price items. Coastland explained at trial that the "Vanilla Box Cost Estimate" refers to the price Coastland guaranteed to the owner, F.O.M. for the life of the Contract.[29] Moreover, the form was provided to Coastland by Tri–Tech, the construction manager for Defendant on the project.[30] Hence, the fact that the form says "unit cost" instead of "unit price" is not relevant to Coastland's intent since it did not label these estimates as "unit costs."

Also, the Contract's lack of specificity with regards to unit costs stands in stark contrast with the Contract's specificity with regards to change orders. The change order provision specifies that these orders would be limited to a ten percent markup. The provision prescribes that increases in the lump sum price attributable to a change order shall not exceed the sum of (i) *actual* labor cost, (ii) *actual* cost of materials, (iii) *actual* cost for additional bond, and (iv) no more than 10% of the total of "i" and "ii" for total Contractor and sub-contractor overhead, profit, general and special conditions, bonds and insurance. Section 9.03 of the Contract specifies, "In no event shall more than one mark-up of 10% be applied to any change order..." These provisions suggest that only change orders increasing the lump sum price would be limited to a 10% profit or markup. In contrast to the change order provision, the Contract's provision on unit prices does not state that unit prices are limited to a 10% markup. Instead, the provision states that "the unit prices shall be binding for the life of the Contract."[31]

On this question the Court also looks to industry standards for guidance. *Industrial Electric–Seattle Inc. v. Bosko*, 67 Wash.2d 783, 410 P.2d 10 (1966) (Courts recognize that customary usage in the industry is probative of a party's intent.). This Court has recognized that industry practice and custom play prominent roles in interpreting construction contracts. *Mitsui & Co., Inc. v. Puerto Rico Water Resources Authority*, 528 F.Supp. 768, 778 (D.P.R.1981). The Puerto Rico Supreme Court has established that to determine the intention of the parties to a construction contract, particular emphasis must be given to the specialized knowledge that the parties may have concerning the subject matter of the contract. *Levy v. Autoridad de Edificios Publicos*, 135 D.P.R. 382 (1994). Any ambiguity between the par-

---

27. Testimony of Dorsey.

28. Defendant premises this argument on the fact that in the Contract's "Vanilla Box Cost Estimate" there is a separate line item for "10% markup" which follows the "Grand Subtotal" line, and next to "Grand Subtotal" it reads "(Not Including Markup)."

29. Testimony of Dorsey.

30. In this form, Tri–Tech filled in the quantities for each unit and Coastland filled in the "unit cost" column.

31. Joint Exhibit VI.

ties as to the unit prices should be resolved in favor of the industry standard. *Darwin Const. Co. v. United States,* 31 Fed.Cl. 453 (1994) (ambiguity was to be construed in accordance with specialized usage trade).

In the construction industry, it is generally recognized that unit prices include profit and markup. According to the Eighth Circuit in *Johnson, Drake & Piper, Inc. v. United States,* 483 F.2d 682 (8th Cir.1973):

> It is necessary that such units share not only the direct material inventory and labor involved but also the overhead costs and profit (margin) on the job. These latter elements may be apportioned ratably among all units, or, because the inherent uncertainty as to precisely how many units in each category may ultimately be utilized, certain units may be 'loaded.' That is, units apt to be most certainly predictable, for instance, as to quantity, may be 'loaded' with a disproportionate share of overhead and margin, thus resulting in what is termed an "unbalanced" bid. *Id.* at 684.

The Court in *Johnson* recognized that in the construction practice unit prices include a potential amount of unrealized profit, as each individual price is quoted as a lump sum on the basis of the quantity of work to be performed.

Providing further support to the proposition that unit prices include profit, the contractor in *Pacific Architects and Engineers Inc.,* 906 F.2d 1345 (9th Cir.1990) contended that public release of its "unit price rates" would cause potential harm to its competitive position because it would enable a competitor to determine the contractor's profit margin. The contractor argued that a competitor would be able to calculate its profit margin simply by subtracting from the "unit price rates" in the contract the various component parts which make up those rates; and according to the contractor, these component parts are either set by statute or standardized within the industry. *Pacific* at 1347.

The parties to this Contract were professionals with sophisticated business acumen. Tri-tech, the company who negotiated the Contract on behalf of the Defendant, is a large New York construction management firm that works for Belz Enterprises. According to Dorsey, during the negotiations leading up to the Contract, it was never suggested to anyone that the unit prices that appear in the breakdown were the exact actual costs to Coastland. Confirming Dorsey's testimony, Andrew Groveman, F.O.M. Vice–President, testified that during the contract negotiation he never discussed with anyone from Coastland whether the unit prices only included costs to Coastland. Also, although Defendants maintain that they were unaware that the unit price included markup, Errol Flynn, Belz Construction's Vice–President, admitted that when he gets a unit price for a Belz project, one of the components of those unit prices is markup.[32]

Accordingly, in light of the testimony and evidence presented at trial, the Court concludes that Coastland's unit price estimates properly included a markup and are binding under the Contract. If F.O.M. thought it was being overcharged, it should have consulted with its experts prior to accepting the unit prices and signing the Contract. At this time the Court will not allow F.O.M. to get out of what it views as a bad bargain.

### B. Change Order No. 10

On March 30, 2001, the parties modified the Contract by mutual consent.

---

**32.** Testimony of Flynn.

Phase I work would continue under the unit price structure, but Phase II work would be quoted on a lump sum basis per store. The contract was to be modified to roll over all Phase II (Vanilla Box) work into lump sum amounts by store. However, this process was never finalized.

F.O.M requested quotes from Coastland, and the parties were able to reach mutually agreeable lump sum amounts for the Vanilla Box work in eleven stores. In addition to these eleven stores, other stores remained for which Coastland had performed Phase II work but the parties had not been able to reach agreeable lump sum amounts for their construction.

Coastland seeks to bill for the Phase II work performed on the non-lump stores on a unit price basis. F.O.M. asserts that Coastland is not entitled to bill or recover for work on these stores on the unit price basis because these prices were removed from the contract by Change Order No. 10. F.O.M. maintains that Coastland agreed that it would bill F.O.M. for the invoice price from the subcontractors plus a fifteen percent (15%) markup.[33] However, a letter from to Groveman sent prior to issuing Change Order No. 10 disproves Defendant's position. In this letter, dated April 2, 2001, Dorsey recaps the meeting between the parties where they agreed to modify the contract.[34] Under the "Billing" heading it reads: "Phase II: If CCI is not awarded a space that work has been completed in to date, a verification of units in place will determine billing due to CCI." During negotiations Coastland made clear that if it was not awarded the store as a lump sum, the work in place would be evaluated, and it would be paid under the unit price structure. F.O.M adduces no evidence to support its interpretation.

Morever, Change Order No. 10, which is dated April 25, after Dorsey's letter, makes no reference to the billing for these stores. The Change Order only instructs for the deduction of Phase II cost items from Coastland's previous pay applications.[35]

Pursuant to general contract principles, the intention of the parties is the foremost consideration in contract interpretation. See Art. 1233, Civil Code, PR. Laws Ann., Tit. 31, Sec. 3471. When Coastland agreed to the deductive change order, Coastland was expecting to be paid for the Phase II work by unit price, or on a lump sum basis if an agreement was reached as to a particular store. In light of Dorsey's credible testimony and the supporting evidence presented at trial,[36] the Court concludes that the Phase II work performed on the non-lump sum stores was properly billed by Coastland under the unit price structure.

## 2. Amounts due to Coastland under the Contract

▉ Defendant maintains that Plaintiff's recovery should be barred under the doctrine of unclean hands. F.O.M. submits that since Coastland's unit prices contained additional markup beyond its actual costs, Coastland violated the terms of the Contract. F.O.M. maintains that this conduct constitutes fraud and that the doctrine of unclean hands should prevent Coastland from recovering any amount due under the Contract.

This Court has determined that the fact that Coastland's estimate for unit prices contained a markup does not violate the terms of the Contract. Moreover, based on the testimony and evidence presented at trial, the Court finds that Plaintiff's

---

33. Testimony of Flynn.

34. Joint Exhibit VII.

35. Defendant's Exhibit J–1.

36. Dorsey's letter, Joint Exhibit VII.

conduct throughout the course of the project does not evidence an attempt to defraud F.O.M., nor does the Plaintiff's conduct constitute a breach of the duty of good-faith and fair dealing. Hence, the Court finds no action on the part of Coastland that would warrant application of the unclean hands doctrine.

The Court proceeds with a determination of the amounts due to Coastland for its work on Phase I and Phase II pursuant to the Contract. As a preliminary matter, F.O.M. is entitled to set-off the amounts which it paid directly to Coastland's subcontractors and suppliers on the project. Coastland has included these amounts in its claim for recovery and has not credited F.O.M for any payments to Coastland's subcontractors. Although F.O.M. has paid a total of $427,305.04 to Coastland's subcontractors, Coastland maintains that this amount is in excess of what it owed the subcontractors, and does not include payments towards the subcontractor Fox Concrete Cutting.[37] Coastland's computation results in a net deduction of $312,477.56.[38] The Court finds that F.O.M. is entitled to a credit for this amount.

### A. Phase I

Coastland claims that it is entitled to $2,182,863.73 for work performed under Phase I of the Contract. F.O.M. asserts that Coastland is only entitled to $1,857,320.48. F.O.M. asserts that Plaintiff is entitled to $325,543.25 less because Coastland did not earn the remaining $100,000 for general conditions, and it billed for more work than it completed.

■ The Court will first address whether Coastland is entitled to the $100,000 for general conditions. The Contract provided that Coastland would be entitled to $700,000.00 for its general conditions (job overhead) costs for all the work under Phase I and II of the Contract. Coastland attempts to recover the entire allowance amount for its general conditions because such was pro-rated on a monthly basis and at the time of termination, the contract term of 253 days had expired. However, Coastland did not complete all the work under the Contract prior to its termination, nor did Coastland provide all the items it was suppose to supply as general conditions under the Contract. For example, the Court is not persuaded that Coastland provided a job trailer on site.[39] Also, according to Flynn, Coastland almost never staffed the project with the proper number of supervisors. Moreover, Dorsey testified that Coastland actually spent approximately $680,000 of the total allotted to general conditions ($20,000 less than what it seeks). Taking into consideration this $20,000 difference, and subtracting the value of the job trailer ($14,000), F.O.M. must pay Coastland a total of $66,000 for general conditions.

■ The Court further concludes that F.O.M. is entitled to a credit for the bond premium. The bond premium of $63,316 was approximately 1 percent (1%) of the total contract amount to be performed by Coastland ($6,160,527). This bond amount is listed as the line item "Payment and Performance bond" under "General Conditions." According to Coastland's calculations, it performed approximately $3,800,000 of work in Phase I and Phase II. The Estimate specifies that "the line item for payment and performance bond is an allowance and shall be modified as the scope of work increases or decreases at a rate of 1%."[40] Consequently, F.O.M. is entitled to a credit for the smaller bond

37. Joint Exhibit XIII.

38. Id.

39. Testimony of Dorsey.

40. Joint Exhibit VI.

premium amount of approximately $38,000. In light of the difference between the original bond premium ($63,316) and the bond premium for Coastland's actual scope of work (approximately $38,000), the Court concludes that F.O.M. is entitled to the credit for the bond premium it seeks in the amount of $20,000.

F.O.M maintains that Coastland did not complete 100% of the work for which it billed F.O.M for Phase I. F.O.M. demonstrated at trial that Coastland applied only two coats of paint in stores where the Contract specified that the storefronts were to receive three coats.[41] F.O.M. also demonstrated that Coastland had not terminated 100% of the EIFS work[42] for which it billed F.O.M., nor did it install the base moldings.[43] Johnny Smith, F.O.M.'s supervisor on the project, testified at trial about several examples where Coastland had billed for more work than it actually performed. Although Coastland offered credits for the EIFS work on the K.B. Toys and Famous Footwear stores, F.O.M. presented photographs at trial demonstrating that these credits were inadequate. F.O.M.'s estimate of the work Coastland performed in Phase I is $1,857,320.48, which is approximately 90% of the amount Coastland has billed F.O.M. for this work. At trial, Coastland presented detailed notes of the scopes of work it accomplished and supported such with videos.[44] Although Coastland did not establish to the satisfaction of the Court that it completed 100% of the work for which it billed F.O.M. in Phase I, nor is the Court convinced that Coastland completed only 90% of the work as F.O.M. proffers. In light of the testimony and evidence presented at trial, the Court concludes that a more reasonable calculation is that Coastland performed 95% of the work for which it billed F.O.M. Hence, Coastland is entitled to $1,978,719 for its work on Phase I.

In sum, F.O.M owes Coastland $66,000 for general conditions, minus the $20,000 credit for the bond premium, plus $1,978,719 for work completed, totaling $2,024,719 for Phase I.

### B. Phase II

As to Phase II, F.O.M. and Coastland agree that Coastland is owed $289,100 for the four completed stores in Phase II. With regards to the six uncompleted stores, the parties dispute the percentage of completion. Plaintiff claims that it is entitled to $334,124.25 for work performed on these stores, while Defendant claims that Coastland is only entitled to $257,908.28. Coastland was unable to complete these stores due to its termination by F.O.M. Upon their termination, Dorsey and Bill Campbell, Coastland's project manager, measured all the storefronts and made a determination of the work completed. F.O.M. conducted its own measurements and determined that Coastland's percentage of work performed was inaccurate. According to Flynn's testimony, Coastland billed for most of the sprinkler system work and electrical work in stores where this work was barely completed. Based on the testimony presented by each party at trial, the Court concludes that Coastland is not entitled to the entire amount it claims for these six Phase II stores. The Court determines that F.O.M. is entitled to a $25,000 credit for these

---

41. Testimony of Flynn.

42. EIFS is an exterior insulating finish system that is applied in the construction industry.

43. Although Coastland offered a credit of $14,396 for the base moldings, Flynn indicated at trial that this credit was insufficient as the materials cost $22,000 plus installation charges.

44. Plaintiff's Exhibit No. 7.

stores, and factoring the credit, it owes Coastland $309,124.25 for the work completed.

The parties also dispute the amount owed to Coastland for work performed on the Phase II stores for which the parties were unable to agree on a lump sum price. As previously discussed, Coastland claims that these stores should be billed according to the unit price structure while F.O.M. claims that these stores should be billed at cost plus 15% markup. The Court has found that the Phase II work performed on the non-lump sum stores was properly billed by Coastland under the unit price structure. Nevertheless, the Court must analyze whether Coastland's calculation for the percentage of work completed is accurate.

F.O.M. maintains that Coastland's claim for the work completed on these Phase II non-lump sum stores is exaggerated. Smith, F.O.M.'s supervisor, presented photographs at trial illustrating that Coastland had not performed all the drywall and bulkhead extension work for which it billed. F.O.M maintains that Coastland overbilled it by $133,381.19.[45] Coastland, in turn, presented detailed notes of the scope of work it completed and submitted videos at trial illustrating the work performed. Nevertheless, the Court is persuaded by the evidence F.O.M. presented at trial, and finds that Coastland did not perform 100% of the work for which it billed F.O.M. for these stores. In light of the testimony and evidence presented by the parties, the Court concludes that a reasonable credit for F.O.M. is $80,000 for the work performed on these stores. Hence, F.O.M, must pay Coastland $769,416.46 for the work performed on the non-lump sum Phase II stores.

### C. Cancellation Charges

Coastland claims that it is entitled to $30,000 in cancellation charges as a result of the termination. The Contract provides that in the event of termination, Coastland would be entitled to reimbursement "for all documented costs, including reasonable cancellation charges." However, Coastland never provided F.O.M. with documented costs to support this claim as required by Section 24.02 of the Contract. Coastland maintains that it incurred cancellation costs because every storefront had to be measured and detailed notes were taken on the scope of work completed.[46] However, Coastland never provided any documentation or evidence at trial of these costs. Given that Coastland provided no documentation, it had no equipment on site and actually stayed on the project site after its termination to perform other work for tenants of the stores,[47] the Court concludes that Coastland is not entitled to the $30,000 it seeks for cancellation charges.

### D. Additional charges

F.O.M. agrees with Coastland's claim for $116,393.06 for stored materials on the project, and the parties do not dispute the previous payments to Plaintiff which amount to $2,371,066.53 for work Coastland performed on the project.

Both parties claim that they are entitled to recovery of attorney's fees. F.O.M maintains that it is entitled to these fees as a result of being forced into litigation to enforce the terms of the Contract, and as a

---

**45.** F.O.M. asserts it is being overbilled by Coastland by $163,381.19. However, according to Dorsey the amount attributable to unit price billing is $30,000.

**46.** Testimony of Dorsey.

**47.** Testimony of Flynn.

result of Coastland's breach of contract. The Contract provides that F.O.M is entitled to recover all of its costs, expenses and attorney's fees from Coastland as a result of Coastland's "breach or threatened breach of any term or condition of" the Contract.[48] As previously stated in this Opinion, the Court has concluded that Coastland did not defraud F.O.M., nor has it breached the Contract between the parties. Consequently, the Court holds that F.O.M is not entitled to recover its costs, expenses or attorney's fees from Coastland pursuant to the Contract.

Coastland maintains that it is entitled to attorney's fees because F.O.M. has been obstinate in the course of this litigation. In the event a party has been obstinate, the Court shall impose the payment for a sum of attorney's fees which the Court decides corresponds to such conduct. 32 L.P.R.A.App. III, Rule 44.1(d). *See also de León v. Corporación Insular de Seguros,* 742 F.Supp. 44 (D.P.R.1990), *aff'd,* 931 F.2d 116 (1st Cir.1991). A finding of obstinacy is a penalty to those parties whose litigation practices result in an "unreasonable pertinaciousness." *Reyes v. Banco Santander,* 583 F.Supp. 1444, 1445 (D.P.R. 1984) (To impose attorney's fees the court must find that a party was obstinate, that he was stubbornly litigious, prolonging the duration of the suit or causing the plaintiff unnecessary inconvenience and expenses.) The Court finds that F.O.M. has been cooperative with Coastland throughout the course of this litigation and finds no obstinacy on the part of F.O.M. Hence, the Court holds that Coastland is not entitled to attorney's fees.

In conclusion, the Court holds that Coastland is entitled to the following:

48. Joint Exhibit VI.

| | | |
|---|---|---|
| (+) | $ 66,000 | General Conditions |
| (+) | $1,978,719 | Phase I work |
| (+) | $ 289,100 | 4 completed Phase II stores |
| (+) | $ 309,124.25 | 6 uncompleted Phase II stores |
| (+) | $ 769,416.46 | 4 uncompleted non-lump sum Phase II stores |
| (+) | $ 116,393.06 | Stored Materials |
| = | $3,528,752.77 | **Subtotal** |

Less

| | | |
|---|---|---|
| (−) | $ 20,000 | Bond Premium Credit |
| (−) | $2,371,066.53 | F.O.M. Payments |
| (−) | $ 312,477.56 | Subcontractor Payments |
| = | $ 825,208.68 | **Grand Total** |

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

## JUDGMENT

This action came on for trial before the Court, the undersigned Judge presiding, and the issues having been duly tried, and a decision having been duly rendered,

It is Ordered and Adjudged.

That Plaintiff, Coastland Construction, Inc., receive from Defendant F.O.M Puerto Rico, S.E., the sum of Eight Hundred Twenty Five Thousand Two Hundred Eight and Sixty Eight Cents ($825,208.68) plus interest pursuant to 28 U.S.C. § 1961. Costs to Plaintiff.