UNITED STATES of America, Appellee,

v.

Clayton JOHNSON, Appellant.

No. 90–5235.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 16, 1990.
Decided June 25, 1991.

---

Robert Brunig, Minneapolis, Minn., argued (John S. Foster, Grand Forks, N.D., on brief), for appellant.

Vicki Aldridge, Asst. U.S. Atty., argued (Dennis Fisher, Asst. U.S. Atty., on brief), Fargo, N.D., for appellee.

Before LAY, Chief Judge, FAGG, Circuit Judge, and WRIGHT,* District Judge.

LAY, Chief Judge.

Clayton Johnson appeals his conviction after a jury trial on two counts of making false, fictitious and fraudulent statements to a government agency in violation of 18 U.S.C. § 1001 (1989).[1] On appeal he argues, inter alia, that there was insufficient evidence that the statements were material. We reverse with order to dismiss the judgment of conviction on Count II, and order a new trial on Count I.

## BACKGROUND

Clayton Johnson is a partner in Dakota Woodworks, located in Grand Forks, North Dakota. In 1987, Dakota Woodworks received a subcontract from Orvedahl Construction, Inc. for labor and miscellaneous materials necessary to install previously purchased window units in 1124 window openings in family housing at Grand Forks Air Force Base. The agreement required the Air Force to pay Dakota Woodworks $213,896 on the subcontract.

The Air Force had purchased the window units Dakota Woodworks was to install years earlier and knew that some of them

---

* The HONORABLE SUSAN W. WRIGHT, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. Johnson was sentenced to six months "home detention," fined $5000, and put on probation for three years.

had been damaged from improper handling and storage. Between February 16, 1988 and April 8, 1988, Dakota Woodworks and the Air Force conducted an inventory of the government-owned window units. On April 20, 1988, Johnson wrote the Air Force that the inventory showed that 432 window units were damaged or missing. The windows deemed non-usable were segregated from the usable ones. (T. 912). Johnson stated that his installers had only enough non-damaged windows to work through the end of April. On May 2, 1988, the Air Force contracting officer directed Johnson to provide him with his cost for purchasing additional windows and amount of time extension needed to complete the contract.

On May 13, 1988, Pat Trudel, an Air Force civil engineer, reinspected the window inventory. According to the Air Force's count, there were approximately 313 unusable windows. (Govt.Ex. 10). In a letter dated May 13, 1988, the Air Force notified Johnson of the new count and requested a bid on the cost and delivery for the "indicated quantities." The letter stated: "On the attached sheet is the window count as we see it.... We have elected to accept windows listed as scratched, painted, or having minor warping." (Govt.Ex. 11). According to the government's testimony, this information was not intended to tell Dakota Woodworks which particular windows previously determined to be non-usable were now acceptable, leaving that up to Dakota Woodworks installers. (T. 990). The May 13th letter stated: "Using the information provided please provide us with your cost and delivery time for the indicated quantities." On June 15, 1988 Air Force contracting officials met with Johnson and again told him that "for pricing purposes he should use the inventory included in the May 13, 1988 letter" even though the "inventory wasn't a hundred percent accurate." (T. 445). Thus, the Air Force directed Johnson to submit a supplier quote for prices on 313 new window units.

On June 15, 1988, Johnson called a window supplier, Poly Products, and requested a price quote on each type and quantity of window unit listed in the May 13th letter carried by Poly Products. After getting a quote for 200 window units from Poly Products' president, Helge Rommesmo, Johnson called back and asked for a quote ten percent higher. Five days later, Johnson told the Air Force he could complete the job for about $160,000, and they told him to put his proposal in writing. On June 29th, Johnson called Rommesmo and told him ten percent was too much and asked for a quote that was only five percent higher than the original quote. Johnson then submitted the inflated Poly Products price quote to the Air Force, showing the quantity of each type of window unit and its price. Govt.Add. at 1. The quantity figures were based on the May 13th letter from the Air Force. Johnson also submitted a quote from a different supplier for the remaining 113 window units, but that quote does not figure directly in the prosecution. The Air Force subsequently informed Johnson that he would need to submit a Certificate of Current Cost or Pricing Data ("Certificate") certifying that the window prices he submitted were "accurate, complete, and current." On July 18, 1988, Johnson signed and submitted the Certificate.

On July 18, 1988, Johnson and the government executed a modification to the existing contract, specifying that the contract price was being changed from an estimated quantities contract for $213,896 to a lump-sum contract for $360,000.[2] The modification indicated that Dakota Woodworks agreed to provide new prime windows necessary to complete the buildings listed in the original contract, and indicated that approximately 313 windows would be required. (Govt.Ex. 25; T. 233–34). The lump-sum modification was intended to cover the purchase of the additional windows plus a standard percentage overhead amount.

Dakota Woodworks cleaned all the government-provided windows and continued installing windows that met contract specifications. The installers took windows

---

**2.** Under a lump-sum agreement, the contractor agrees to complete the work for a set price, regardless of the actual costs incurred in completing the construction.

from the inventory of windows previously marked unusable if they met the criteria listed in the Air Force's May 13th letter. Johnson left it to his on-site supervisor, James Pender, to determine which windows were usable within the meaning of the May 13th letter. Air Force personnel were at the job site and inspected and approved every window that Dakota Woodworks installed. (T. 544). Air Force inspectors knowingly approved some of the previously rejected windows installed by Dakota Woodworks. (T. 896). All the windows that were installed met the contract criteria and passed independent air filtration tests. (T. 266–67, 384–86). Johnson relied on Pender to tell him when the supply of usable windows was exhausted. (T. 938–39). Johnson did not order any new window units until August 16, 1988. At that time, Johnson called Poly Products and ordered 56 window units for $24,807. These were the only new windows Johnson ordered from Poly Products.

Because Johnson had installed many previously rejected window units from the Air Force inventory rather than purchasing the new window units called for in the contract modification, the government withheld approximately $100,000 of the final payment due on the contract. Johnson claimed that the rejected windows from the government inventory became his property under a clause in the contract calling for contractor disposal of unusable materials. The government disputed that interpretation. (T. 241–2). The breach of contract dispute was litigated in a civil proceeding.

## ANALYSIS

The government indicted Johnson on two counts of making a false statement under 18 U.S.C. § 1001.[3] Count I read as follows:

**3.** 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

### COUNT ONE

On or about July 5, 1988, in the District of North Dakota,

### CLAYTON JOHNSON,

defendant herein, did knowingly and willfully make and cause to be made false, fictitious and fraudulent statements and representations as to material facts in a matter within the jurisdiction of the United States Air Force, an agency of the United States, in that he submitted a false and inflated price list claiming that 200 windows from Poly Products of Fargo, North Dakota, would cost $101,-225.85 whereas in truth and in fact as defendant Clayton Johnson well knew, both the number and the cost of windows was approximately 56 at a cost of approximately $24,807, in violation of [18 U.S.C. §] 1001.

App. at 1.

Count II alleged:

### COUNT TWO

On or about July 18, 1988, in the District of North Dakota,

### CLAYTON JOHNSON,

defendant herein, did knowingly and willfully make and cause to be made false, fictitious and fraudulent statements and representations as to material facts in a matter within the jurisdiction of the United States Air Force, an agency of the United States, in that he submitted a Certificate of Current Cost or Pricing

It is generally recognized that section 1001 creates two distinct offenses with different elements: (1) concealing material facts from a federal agency by trick, scheme, or device; (2) making false or fraudulent statements of material facts to a federal agency. *See United States v. Mayberry*, 913 F.2d 719, 722 n. 7 (9th Cir. 1990); *United States v. St. Michael's Credit Union*, 880 F.2d 579, 590 (1st Cir.1989).

Data on behalf of Dakota Woodworks, Clayton Johnson, partner, when in truth and in fact as defendant Clayton Johnson well knew the Certificate was misleading and false since he certified a need for approximately 222 windows that were never purchased; in violation of [18 U.S.C. §] 1001.

App. at 2.

### A. VARIANCE

■ Johnson first argues that the indictment was fatally defective because it alleged Johnson made a false *statement* when the wrongful conduct at issue was actually the making of a false *writing*. We reject this argument. Although different clauses of section 1001 speak of false statements and false writings, there is not a substantive legal distinction between false oral statements and false writings under section 1001. *United States v. Popow*, 821 F.2d 483, 487 (8th Cir.1987); *see also United States v. Daily*, 921 F.2d 994, 1000 (10th Cir.1990). Johnson also argues that the indictment and instructions to the jury stating that he could be convicted for making or "causing to be made" false statements was erroneous because the statute does not prohibit statements one causes to be made. We also reject this argument. The "causing to be made" language is proper charging language in this and other circuits. *See, e.g., United States v. Lanier*, 578 F.2d 1246, 1250 (8th Cir.), *cert. denied*, 439 U.S. 856, 99 S.Ct. 169, 58 L.Ed.2d 163 (1978); *United States v. Kirby*, 587 F.2d 876, 878 (7th Cir.1978).

### B. MATERIALITY

■ Johnson contends that the government failed to prove all the elements necessary to sustain a conviction under 18 U.S.C. § 1001. To prove a violation of the "false statement" portion of section 1001, the government must show: (1) the defendant made a statement; (2) the statement was false, fictitious or fraudulent as the defendant knew; (3) the defendant made the statement knowingly and willfully; (4) the statement was within the jurisdiction of a federal agency; and (5) the statement was material. *United States v. Hicks*, 619 F.2d 752, 754 (8th Cir.1980); *see also Daily*, 921 F.2d at 999.

■ Materiality is an essential element of the offenses set forth in 18 U.S.C. § 1001, which the government must prove beyond a reasonable doubt. *Hicks*, 619 F.2d at 754. A statement is material if it has the natural tendency or capability to influence a governmental agency's decision or performance of an agency function. *See United States v. Whitaker*, 848 F.2d 914, 916 (8th Cir.1988); *Popow*, 821 F.2d at 488. Actual reliance by the government is not necessary. *United States v. Goldfine*, 538 F.2d 815, 820–21 (9th Cir.1976). In this circuit, materiality in a section 1001 case is a question of law for the district court to decide. *See United States v. Kneen*, 889 F.2d 770, 773 (8th Cir.1989); *United States v. Richmond*, 700 F.2d 1183, 1188 (8th Cir. 1983). We find Johnson's responsive statements as to the quantity of windows, which formed an integral part of both counts of the indictment, were not material allegations which could have affected or influenced the exercise of governmental decisions.

### *Count I*

Count I of the indictment alleged that Johnson made a false and fraudulent statement by submitting "a false and inflated price list" claiming 200 windows from Poly Products would cost $101,225, "whereas in truth and in fact as defendant Clayton Johnson well knew, both the *number* and the *cost* of windows was approximately 56 at a cost of approximately $24,807." (App. at 1) (emphasis added). By wording the indictment in this fashion, the government sought to prove that the price list as submitted was false both because it was inflated and because the quantities listed on the price quote were incorrect. The district court recognized that Count I depended on *both* falsified price and falsified quantity information. (Pre.T. 193).[4]

---

4. On appeal, the government urges that Count I rests entirely upon the inflated price informa-

tion in the Poly Products quote submitted by Johnson. The plain reading of the indictment

It is clear that the number of windows provided in the price quote could not have influenced the government in accepting Johnson's bid because the government had specifically requested Johnson to provide a price quote for the same quantity of windows. Prior to Johnson's submission of his bid, the Air Force had conducted an inventory, and had determined the number of new windows it believed were needed. Johnson simply complied with the Air Force's request for a supplier quote based on that count. The government now complains that Johnson submitted materially false quantity information because he knew the actual number of windows he would need to purchase was only approximately 56.[5] The record does not support this allegation.[6] The record is undisputed that both the Air Force and Johnson did not know precisely how many damaged windows could be reused. The price quote submitted by Johnson never stated or certified that he intended to purchase 200 windows. The government cannot infer Johnson was certifying a need for the windows when the document does not indicate such a certification and when he was simply responding to the Air Force's own directive. Instructive on this point is *United States v. Mayberry*, 913 F.2d 719 (9th Cir. 1990). In *Mayberry*, a real estate broker arranged to briefly deposit money into the bank account of one of his customers so that the customer could claim the money as assets for certain loan applications. The bank was directed to verify the amount of money in the account to the government, which it did. *Id.* at 721. The court held that the government could not infer that the bank was certifying that the money actually *belonged* to the customer, and the bank's statement was therefore not materially false. *Id.* at 721–22.

Duane Mann, the Air Force price analyst, explicitly instructed Johnson that for pricing purposes he should use the inventory included in the Air Force's May 13, 1988 letter to Orvedahl Construction. In response Johnson did only what the Air Force told him to do. Under the circumstances we fail to see how the Air Force could have been influenced by Johnson's response about the quantity of windows. *See United States v. Cowden*, 677 F.2d 417, 420–21 (8th Cir.1982) (holding that false statement was not material when the government's deliberate conduct contributed to the existence of the false statement).

The government stresses that the price information was indisputably inflated and inaccurate, making the statement submitted (the Poly Products price quote) inherently false and capable of influencing agency decision-making. However, the indictment and the government's whole theory at trial revolved around proof that the

demonstrates that the government alleged that both quantity and price were integral parts of the false statement.

5. The government's primary argument is stated in its brief: "The information submitted by Johnson on quantities and prices of windows was false in several respects. Besides being padded, the Poly Products price quote was misleading, since Johnson had no intention of purchasing 200 window units." Govt.Br. at 8.

6. None of the testimony established that Johnson knew at the time he submitted the Poly Products price quote he would be buying only 56 windows. James Pender, Dakota Woodworks' on-site supervisor, testified that in following the Air Force's May 13th letter, he kept installing windows he felt were usable and decided at what point additional new windows would have to be ordered. (T. 938–39). Johnson had no input into this decision and Pender did not inform Johnson of what the actual count would be until Pender determined there were no more usable windows. (T. 939–40). The evidence is undisputed that Johnson could not have known the exact number of windows he would have to order for quite some time. Johnson did not order any windows until August 18, 1988, over a month after he submitted the price quote.

Additional probative testimony came from Johnson's business attorney, John Foster, who testified that Johnson sought his advice on July 15, 1988 about the terms of the contract modification. Johnson was "very concerned" over the lump sum nature of the contract, and asked whether he was assuming the risk that he might have to order more than the 313 windows called for if more windows in the government inventory were found to be unusable. (T. 1142–43). This demonstrates that at the time he submitted the Poly Products quote and the Certificate, Johnson did not know if the number of new windows would be more or less than the Air Force's estimate of 313.

price quote was materially false because it was based on over 200 windows that Johnson fraudulently represented he would need to purchase.

Under Count I the government had the burden of proving that both the allegedly false price and quantity information had the capability of influencing it to modify its contract with Johnson. Significantly, Johnson made a pre-trial motion asking the court to strike the language in Count I concerning the quantities of windows for the very reason urged here, namely that using the window numbers provided by the government could not have had the capability of influencing the Air Force's decision-making. (Pre.T. 167; App. at 110–11). The government resisted the motion and the trial court refused to strike the language. We believe the trial court erred in not striking this language. Clearly, the Poly Products price quote as it relates to prices of windows was material, as the government based its decision on whether to modify the contract on the prices quoted. *See, e.g.,* T. 225, 229. Under the circumstances the government should be allowed the opportunity to present its case that Johnson made a false statement based upon inflated prices in the Poly Products price quote. The language concerning false quantities of windows should be stricken and a new trial held on Count I.

*Count II*

Count II is based entirely on Johnson's submission, at the request of the Air Force, of a Certificate of Current Cost or Pricing Data relating to the inventory bid covered by Count I. The entire text of the Certificate read as follows:

This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 15.801 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.804–2) submitted, either actually or by specific identification in writing, to the contracting officer or to the contracting officer's representative in support of modification number P00002 to contract F32605–88–CC006 are accurate, complete, and current as of 14 Jul 88. This certification includes the cost of pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are a part of the proposal.

Govt.Ex. 26; Govt Add. at 3.

Under Count II the government alleged that Johnson's submission of the Certificate of Current Cost or Pricing Data constituted making a false or fraudulent statement because "as defendant Clayton Johnson well knew the Certificate was misleading and false *since he certified a need for approximately 222 windows that were never purchased.*" (emphasis added).[7] Count II does not relate to price.[8] The government argues the Certificate must be read to refer back to the Poly Products quote which listed quantities. However, this argument does not aid the government because, as earlier discussed, Johnson provided the Air Force a price quote based entirely on the quantity of windows submitted by the Air Force to Johnson. As in Count I, the government has failed to show how the Certificate was capable of influencing the Air Force in the manner alleged

---

**7.** Apparently, the 222 figure in Count II comes from a starting figure of 313 window units that the government inventory showed were needed, less the 56 Johnson bought from Poly Products, less 35 units Johnson got from another supplier or from his own inventory.

**8.** The government's chief witness before the grand jury stated in unequivocal terms that the Certificate is to certify that the price is accurate, and said nothing about quantities. James Robards, a government special agent, testified as follows:

Q: Is there some certification that the person who is the contracting individual like Clayton Johnson must make to the Air Force that he is

giving all the correct true and accurate prices and material costs and so forth to the Air Force?
A: The government contract requires a contractor over a certain amount of money must certify the prices to the government which he provides.
Q: And he says in there [the Certificate of Current Cost or Pricing Data] all the things he supplied to the government *in terms of prices* are accurate, complete and current as of 14 July 1988?
A: That's correct.
Govt.Add. at 19 (emphasis added).

by the government. *Cf. United States v. Talkington*, 589 F.2d 415, 417 (9th Cir. 1978) (per curiam) (finding three false statements in a form requested by a federal agency were not capable of influencing agency decision-making and were thus not material).

This court has previously held that in a section 1001 case, "the government must negative any reasonable interpretation that would make the defendant's statement factually correct." *United States v. Anderson*, 579 F.2d 455, 460 (8th Cir.), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). When the government has created an ambiguity upon which the defendant has reasonably relied in making his statement, the government will ordinarily be unable to negative the defendant's interpretation. *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir.1980). At the very least, the Air Force's directive to submit a price quote and a Certificate of Current Cost or Pricing Data based upon the quantity of windows set forth in the Air Force's May 13th letter created an ambiguity about whether Johnson was certifying that the quantity figure was accurate. In addition, the Air Force's May 13th letter directing Johnson to install some previously rejected windows created an ambiguity over how many government-provided windows should be installed. Having relied on the government's directives, Johnson cannot now be found guilty of making a material false statement about the quantity of windows.

Title 18, section 1001's language prohibiting false and fraudulent statements sweeps broadly. However, as we have stated in another section 1001 case, "[c]riminal sanctions should not be imposed for conduct which is not clearly illegal." *United States v. Larson*, 796 F.2d 244, 247 (8th Cir.1986).

## CONCLUSION

 For the reasons discussed, we find the government presented insufficient evidence that the statements concerning the quantity of windows submitted by Johnson were material. Johnson's submission of the Certificate, which forms the basis of Count II, was based on a quantity of windows requested by the government. Under Count I the false statement charged that Johnson submitted both false price and quantity information. Since the price quote was integrally related to the government's own window count we are unable to know whether the jury found the price alone was false, the number of windows was false, or both were false. *See Talkington*, 589 F.2d at 417–18. Therefore a new trial must be awarded under Count I, with the alleged false statement relating to quantity of windows deleted. The case is remanded for entry of judgment of acquittal on Count II and for a new trial, with directions, on Count I.[9]

**9.** We have reviewed Johnson's other arguments for reversal and find them to be without merit.