2004 SD 78

**PRUNTY CONSTRUCTION, INC., a South Dakota Corporation with its principal place of business in Brookings, South Dakota, Plaintiff and Appellant,**

v.

**CITY OF CANISTOTA, McCook County, South Dakota, Defendant and Appellee.**

Nos. 23077, 23078.

Supreme Court of South Dakota.

Argued April 29, 2004.

Decided June 9, 2004.

Ronald G. Schmidt of Schmidt, Schroyer & Moreno, Rapid City, SD, for plaintiff and appellant.

Timothy W. Bjorkman of Bjorkman & Fink Bridgewater, SD, for defendant and appellee.

MEIERHENRY, Justice.

[¶ 1.] The City of Canistota contracted with Prunty Construction, Inc. for a water and sewer project. The City claims that the contract was paid in full. Prunty claims it is owed an additional sum of $59,428 for work performed under the contract. The trial court granted summary judgment in favor of the City. Prunty and the City appeal.

### FACTS AND PROCEDURE

[¶ 2.] The City hired Sayre Associates, Inc. (Sayre) to design and prepare construction and bidding documents for the construction of two projects: (1) a water main and (2) a sanitary sewer and surfacing improvement. Sayre assigned Monty Miller (Engineer), a professional engineer, to represent the City on this project. Prunty submitted its bid and was awarded the contract. The City paid Prunty partial payments in the amount of $925,587.77 which was the amount Prunty submitted on the original bid form. After the project was completed, the City refused to pay a final change order in the amount of $54,930 plus an additional $4,498 for items inadvertently omitted from the final change order.[1] Prunty filed suit against

---

1. The billing process was that Prunty submitted receipts to the Engineer who would complete the required forms and submit them to the City for payment.

the City alleging breach of contract. Both Prunty and the City moved for summary judgment. The trial court granted summary judgment to the City. Prunty moved for reconsideration. The City requested sanctions against Prunty pursuant to SDCL 15-6-56(g) in its Resistance to Plaintiff's Motion for Reconsideration. The trial court denied Prunty's motion. It also denied the City's request to impose sanctions against Prunty. Both Prunty and the City appeal. The Association of General Contractors of South Dakota (AGC) appears as amicus curiae.[2]

## ISSUES

[¶ 3.] Prunty raises the following issue on appeal:

Whether the trial court erred in granting summary judgment to the City.

[¶ 4.] The City raises the following issue on appeal:

Whether the trial court abused its discretion by not imposing sanctions against Prunty.

## STANDARD OF REVIEW

■ [¶ 5.] Summary judgment grant or denial requires this Court to determine whether genuine issues of material fact exist and whether legal issues were correctly decided. *First Dakota Nat. Bank v. Performance Eng'g and Mfg., Inc.*, 2004 SD 26, ¶ 4, 676 N.W.2d 395, 398. We view the evidence most favorably to the non-moving party, resolving reasonable doubt against the moving party. *Id.* The grant or denial of sanctions is reviewed for abuse of discretion.

**2.** The Association of General Contractors of South Dakota (AGC) moved to file an Amicus

## ANALYSIS

[¶ 6.] The parties disagree as to the terms of the contract. The City claims that the contract is a "lump sum" contract. Prunty claims that the contract is a "unit bid" contract. They also disagree about the final change order and whether the contract requires prior approval of the changes. Both parties argue that the terms of the contract are not ambiguous. In analyzing this case, we will first set forth the trial court's ruling and the positions of Prunty and the City.

*Trial Court*

[¶ 7.] The trial court, while discussing differences between unit bid contracts and lump sum contracts, did not expressly decide this question. Rather, the trial court determined that "the contract between Prunty and Canistota required notice of unanticipated conditions and a halt to the work until the change order was approved." Because the trial court concluded that Prunty did not comply with these requirements, it held that the City was "not bound to pay for these additional expenses."

*City's Claim—Lump Sum Contract*

■ [¶ 8.] The City argues that the contract is a lump sum contract, and that Prunty was required to submit change orders for additional units and have prior authorization in order to be paid for any additional work beyond the contract amount. "Under a lump-sum agreement, the contractor agrees to complete the work for a set price, regardless of the actual costs incurred in completing the construction." *United States v. Johnson*, 937 F.2d 392, n. 2 (8thCir.1991). The City relies on the contract provision that specified a total sum of $925,587.77. The provision states:

Curiae Brief; the motion was granted.

The CONTRACTOR agrees to perform all of the WORK described in the CONTRACT DOCUMENTS and comply with the terms therein for the sum of $925,587.77 or as shown in the BID schedule.

The City claims that Prunty is only entitled to the lump sum amount specified in the contract. The only way Prunty would be entitled to amounts in excess of the contract amount is if Prunty had submitted and the City had approved a change order prior to the work being done. The City further argues that municipalities cannot be held liable for sums greater than the approved original bid because subsequent increases were not approved at a duly-authorized meeting as required by SDCL 9–1–5, 5–18–11 & 5–18–19.

*Prunty's Claim—Unit Bid Contract*

 [¶ 9.] Prunty argues that its contract with the City is a unit bid contract and as such, requires the City to pay for the actual units supplied.

A unit-bid contract is one wherein the contractor submits a price per unit for each of the various categories involved. This type of contract is used where the final quantities of work cannot be determined with accuracy until final completion.

*Johnson, Drake & Piper, Inc. v. United States*, 483 F.2d 682, 684 (8thCir.1973). Prunty admits that change orders had to be submitted but asserts that a "final change order" is contemplated by the contract. Prunty also argues that not all changes required halting the work until a change order was approved. Prunty argues that only certain changes required prior approval. Specifically, changes that

required prior approval were of two types: (1) changes due to *subsurface or latent physical conditions* at the site *differing materially* from those indicated in the contract, and (2) changes due to unknown physical conditions at the site, of an *unusual nature and differing materially* from those ordinarily encountered and generally recognized as inherent in this type of work. Prunty claims that the final change order did not include changes requiring prior approval. Whether the site conditions differed materially or were of an unusual nature would be questions of fact for which summary judgment would be inappropriate. *Sundt Corp. v. South Dakota Dept. of Transp.*, 1997 SD 91, ¶¶ 22–24, 566 N.W.2d 476, 481–82.

## DECISION

 [¶ 10.] Contract interpretation is a question of law reviewed de novo. *Fenske Media Corp. v. Banta Corp.*, 2004 SD 23, ¶ 8, 676 N.W.2d 390, 393. To ascertain the intent of the parties, we rely on the contract's language. *Id.* (citation omitted). Further, to the extent possible, "we must give meaning to all the provisions of a contract." Id. (citation omitted).

[¶ 11.] As part of the contract, the parties signed an agreement which specified that "the CONTRACTOR agree[d] to perform all of the WORK described in the CONTRACT DOCUMENTS and comply with the terms therein ..." The contract by definition included the following: (1) the advertisement for bids, (2) information for the bidders, (3) the Bid consisting of 10 pages listing 146 items, (4) a Bid Bond, (5) Agreement, (6) a 28–page Rural Utilities Service (RUS) Bulletin[3] describing 32 General Conditions, (7) Supplemental Gen-

---

**3.** The Rural Utility Service (RUS) of the Farmers Home Administration (FmHA) was a major funding source.

eral Conditions, (8) Payment Bond, (9) Performance Bond, (10) Notice to Proceed, (11) Change Order (12) 66 pages of Drawings by Sayre Associates, Inc., (13) Specifications prepared or issued by Sayre Associates, Inc., and (14) Addenda Nos. 1 & 2. (*Compare* to what is included in SDDOT construction contract documents noted in *Sundt,* 1997 SD 91, nn. 5 & 6, 566 N.W.2d at 479.) A large portion of the contract consists of RUS form documents. Since RUS partially funded the projects, it imposed certain requirements on the City including the use of its forms.

*"Unit Bid" Contract*

[¶ 12.] To determine if the contract is a "unit bid" contract or a "lump sum" contract, we look to the contract language itself. The clearest indication that the contract is a "unit bid" contract is from the advertisement for the bid and the bid itself. The City's Advertisement for Bids used unit prices for the major items necessary for the projects to be bid. The Advertisement states:

*Approximate quantities* of major construction items include the following:

| | | |
|---|---|---|
| Water Main | 4,230 | L. Ft. |
| Concrete Meter Vault | 1 | Each |
| Sanitary Sewer Pipe | 5,050 | L. Ft |
| 48″ Diameter Manhole | 18 | Each |
| Ordinary Roadway Shaping | 21,045 | Sq. Yd. |
| Aggregate Base Course | 11,264 | Ton |
| PCC Pavement Replacement (8″) | 1,398 | Sq. Yd. |
| Asphalt Concrete Composite | 4,436 | Ton |

(emphasis added). The Bid Form divides the major items listed in the Advertisement into two projects, Schedules A and B. Each Schedule lists the items for that project, totaling 146 bid items for the two projects. For each of the items there is an "estimated quantity" column, "unit" column (measurement), a "unit price" column, and a "total price" column. For example,

the following items appear on the form as follows:

| Item | Description | Est. Quant. | Unit | Unit Price | Total Price |
|---|---|---|---|---|---|
| 38. | Asphalt Concrete Composite | 3411.0 | TON | ____ | ____ |
| ... | | | | | |
| 66. | Temporary Silt Fence | 60 | L.FT. | ____ | ____ |

Sayre, on behalf of the City, filled in the "Estimated Quantity" and "Unit" columns with the anticipated number of units needed to complete the project. Bidders were required to fill in the "Unit Price" and "Total Price" columns. The "Total Price" was derived by multiplying Sayre's estimated "Unit" quantity by the bidder's "Unit Price" amount. Each Schedule was then subtotaled and added together to derive the "Total Gross Sum Bid for Project." Item 85 allowed the bidder to bid one of three alternatives: a Concrete meter vault, a factory built steel package or a precast concrete package. For that item, two alternatives allowed a bid "For the Lump Sum of $ _____" No other item made reference to a lump sum bid. In fact, the form required the contractor to total all 146 items and insert that total on a line entitled "TOTAL GROSS SUM BID FOR PROJECT." Right after the total gross sum bid, the form again refers to the nature of the contract as a "unit bid;" it states:

In the event of a discrepancy between *unit bid prices* and extensions, the *unit bid* price shall govern. The bid will be evaluated and a contract award made on the proposal deemed to be in the best interest of the Owner.

[¶ 13.] Notwithstanding that the Advertisement and Bid Form required the con-

tractors to bid based on unit prices, the City claims that the contract is one for a "lump sum." The City relies on the language of the Agreement signed by the parties to support its interpretation of the contract. A closer look at the provision on which the City relies actually shows a contrary intent. The language and form of the agreement are dictated by RUS Bulletin 1780–13. As with many of the RUS forms made part of the contract, it is written broadly enough to allow for either "lump sum" or "unit bid" contracts. The provision in the form is as follows: "4. The CONTRACTOR agrees to perform all of the work described in the CONTRACT DOCUMENTS and comply with the terms therein for the sum of $ _____ or as shown in the BID schedule." A logical reading of the paragraph would lead one to conclude that the contract price is either shown in the bid schedule *or* if the job was bid as a lump sum, that lump sum amount would be entered in the blank. When the actual agreement was prepared for signatures, someone had typed beneath the blank "Bid Alternate No. 2." Bid alternate No. 2 was item 85—the only item indicated on the Bid Form that could be bid in a lump sum. When the form was completed, however, the total contract price for all 146 items rather than just item 85 was typed above the line. The City claims that this paragraph limits Prunty to $925, 587.77 as a lump sum price. Although the manner of completing the form may be a bit confusing, the provision "or as shown in the BID schedule" clearly points to the document from which the sum is derived. Under the City's interpretation, the phrase "or as shown in the BID schedule" would have no meaning. If, as the City suggests,

that the clause is meaningless to the agreement, it should not have included it. Nevertheless, the advertisement for bid and the bid schedule are not confusing. Both invite the contractor to bid a price by unit based on the City's estimated number of units.

[¶ 14.] Additionally, the bid form contemplates variations in quantities and work. The bid form concludes with an understanding and agreement that the City can unilaterally vary the quantities of material and work and delete contract items. The contract term provides:

> It is understood and agreed that the quantities of material to be furnished and work to be done may be varied on construction as may be deemed advisable by the City of Canistota. It is further understood and agreed that the City of Canistota may, at their option, delete items from the contract.

The language of this provision read in conjunction with the other provisions of the contract makes it clear that the unit quantities initially estimated were subject to adjustment. The City hired Sayre to plan and supervise the project. Sayre engineers attempted to determine from less than precise city drawings the location and condition of the underground systems and the work and materials needed. As evidenced by the bid schedule, the quantities were estimated. Prunty's "bid" was based on the engineer's estimated quantities subject to adjustments during the project.

[¶ 15.] As stated *supra*, "to ascertain the intent of the parties, we rely on the contract's language" and must attempt to "give meaning to all the provisions of [the] contract." *Fenske*, 2004 SD 23 at ¶ 8, 676 N.W.2d at 393. In giving meaning to all

the provisions of the documents making up this contract, we conclude that the parties' agreement is a unit bid contract, not a lump sum contract: (1) the contract documents allow for changes in unit quantity (but not unit price); (2) the units necessary to complete the project were estimated by Sayre, as opposed to Prunty; (3) the bid form included 146 items for unit bidding, however, only item 85 could have been bid in the alternative "for the lump sum of $ _____". In other words, item 85 could have been bid in units as all other items or it could have been bid as a lump sum. Therefore, the bid form itself indicates that it was a unit bid contract. We, therefore, conclude based upon the language of the document that the contract is a unit bid contract.

*Change Orders*

[¶ 16.] The City argues that even if the contract is a "unit bid" contract, Prunty should not be paid for the final change order because Prunty did not get the City's prior approval. The City relies specifically on a provision in a document entitled "Special Conditions," which addresses change orders as follows: "Change orders, if necessary, will be authorized by the Engineer, and approved by the Owner [City], prior to change order work being performed." This provision is, however, one of several provisions in the contract that control change orders. How the parties intended to handle changes is determined from "the entire contract and all its provisions must be given meaning if that can be accomplished consistently and reasonably." *Carstensen Contracting, Inc. v. Mid–Dakota Rural Water Sys., Inc.,* 2002 SD 136, ¶ 8, 653 N.W.2d 875, 877. We have previously applied general principles of contract interpretation as follows:

> In interpreting a contract, we seek to ascertain and give effect to the intention of the parties; at the same time, to find

the intention of the parties, we rely on the contract language they actually used. *Malcolm v. Malcolm,* 365 N.W.2d 863, 865 (S.D.1985). In a case where, as here, several documents comprise the contract, all are to be read together to learn the parties intent. *Dail v. Vodicka,* 89 S.D. 600, 237 N.W.2d 7 (1975). It is a fundamental rule of contract interpretation that the entire contract and all its provisions must be given meaning if that can be accomplished consistently and reasonably. *Id.* at 603, 237 N.W.2d at 9. However, when provisions conflict and full weight cannot be given to each, "the more specific clauses are deemed to reflect the parties intentions—a specific provision controls a general one." *State v. Greger,* 1997 SD 14, 21, 559 N.W.2d 854, 864. Ordinarily, the plain meaning of the contract language will be followed unless there is some ambiguity or different intent manifested. *American State Bank v. Adkins,* 458 N.W.2d 807, 809 (S.D.1990).

*Id.*

[¶ 17.] We must also look at all the provisions in the contract addressing change orders in addition to the section relied upon by the City. The contract defines a change order as an order to the contractor authorizing adjustments in the contract price:

> CHANGE ORDER—A written order to the CONTRACTOR authorizing an addition, deletion, or revision in the WORK within the general scope of the CONTRACT DOCUMENTS, or authorizing an adjustment in the CONTRACT PRICE or CONTRACT TIME.

In the portion of the contract entitled "General Conditions," Section 13 "Changes in the Work" allows the City to order changes for which "an equitable adjustment shall be authorized," and allows the Engineer to make changes "in the details

of the work" with a Field Order.[4] Additionally, Section 14 of the "General Conditions" requires a Change Order if the contract price changes. Section 14 "Changes in Contract Price" states:

> 14.1 The CONTRACT PRICE may be changed only by a CHANGE ORDER. The value of any WORK covered by a CHANGE ORDER or of any claim or increase or decrease in the CONTRACT PRICE shall be determined by one or more of the following methods in the order of precedence listed below:
>
> a. Unit prices previously approved.
>
> b. An agreed lump sum.

The contract specifically requires work stoppage and prior approval in certain circumstances. Section 17 of the General Conditions provides when "subsurface or latent physical conditions ... differ[ ] materially" from the contract specifications, the contractor must not proceed until a Change Order is approved. Additionally, if "unknown physical conditions ... of an unusual nature differ[ ] materially from those ordinarily encountered and generally recognized as inherent," to the project (water and sewer project), the work must stop until approved. The contract states:

> The CONTRACTOR shall promptly, and before such conditions are disturbed, except in the event of an emergency, notify the OWNER by WRITTEN NOTICE of:
>
> 17.1.1 Subsurface or latent physical conditions at the site *differing materially* from those indicated in the CONTRACT DOCUMENTS; or
>
> 17.1.2 · Unknown physical conditions at the site, of an *unusual nature, differing materially* from those ordinarily encountered and generally recognized as inherent in WORK of the character provided for in the CONTRACT DOCUMENTS.

(emphasis added).

[¶ 18.] Section 27 of the General Conditions details the engineer's authority as the City's representative in overseeing the project and interpreting the contract. Subsection 27.1 states:

> The ENGINEER shall act as the OWNER'S [City's] representative during the construction period .... and shall interpret the intent of the CONTRACT DOCUMENTS in a fair and unbiased manner.

Subsection 27.4 states "[t]he ENGINEER shall promptly make decisions relative to interpretation of the CONTRACT DOCUMENTS." *See Subsurfco, Inc. v. B-Y Water Dist.*, 337 N.W.2d 448, 453 (S.D. 1983) (discussing the authority of an engineer in contract cases). This language provides the engineer with the authority to

---

4. The entire section 13 provides as follows:

§ 13.1 The OWNER may at any time, as the need arises, order changes within the scope of the WORK without invalidating the Agreement. If such changes increase or decrease the amount due under the CONTRACT DOCUMENTS, or in the time required for performance of the WORK, an equitable adjustment shall be authorized by CHANGE ORDER.

§ 13.2 The ENGINEER, also, may at any time, by issuing a FIELD ORDER, make changes in the details of the WORK. The CONTRACTOR shall proceed with the ·performance of any changes in the WORK so ordered by the ENGINEER unless the CONTRACTOR believes that such FIELD ORDER entitles the CONTRACTOR to a change in CONTRACT PRICE or TIME, or both, in which event the CONTRACTOR shall give the ENGINEER WRITTEN NOTICE thereof within seven (7) days after the receipt of the ordered change. Thereafter the CONTRACTOR shall document the basis for the change in CONTRACT PRICE or TIME within thirty (30) days. The CONTRACTOR shall not execute such changes pending the receipt of an executed CHANGE ORDER or further instruction from the OWNER.

interpret the intent of the contract "in a fair and unbiased manner."

[¶ 19.] Another portion of the contract entitled "Supplemental General Conditions" amends the General Conditions and supersedes any conflicting provisions of the contract. The Supplemental General Conditions expressly "change, amend, or supplement the General Conditions and *shall supersede any conflicting provisions* of this Contract." (emphasis added). It contains a change order section which clearly gives the City the right to increase or decrease the unit price quantity. Section 2.3 provides:

> When the CONTRACT sum is, in whole or in part, based on unit prices, the OWNER reserves the right to increase or decrease a unit price quantity as may be deemed reasonable or necessary in order to complete the work contemplated by this CONTRACT.

[¶ 20.] Section 2.1 provides for a written change order for all changes agreed to by the City, the Contractor and RUS. The provision states:

> All changes affecting the project's construction cost or modifications of the terms or conditions of the contract must be authorized by means of a written contract change order which is mutually agreed to by the OWNER and CONTRACTOR and is approved by RUS. The contract change order will include extra work, work for which quantities have been altered from those shown in the bidding schedule, *as well as decreases or increases in the quantities of installed units which are different than those shown in the bidding schedule because of final measurements.*

Supplemental General Conditions § 2.1 (emphasis added).

[¶ 21.] This superseding contract provision does not specifically state the need for work to stop until the work is approved.

It also does not specifically state that change orders always need to be completed prior to the work being done. Particularly noteworthy is the language at the end of the section. The language contemplates a final change order based on "final measurements" of units that have already been "installed." It provides: "[t]he contract change order will include ... decreases or increases in the quantities of installed units which are different than those shown in the bidding schedule because of final measurements." *Id.* The conflicting change order provision upon which the City relies appears in a document entitled "Special Conditions." As to change orders, it says, "Change orders, if necessary, will be authorized by the Engineer, and approved by the Owner, prior to change order work being performed." This provision conflicts with the provision in the Supplemental General Conditions which allows adjustment due to final measurements of installed units. The provision in the Supplemental General Conditions controls.

[¶ 22.] The change order in controversy is based on final measurements of installed units. It was submitted on an RUS form made part of the contract and prepared by the Owner's (City's) engineer. The form of the order states that it is from the City directed to Prunty Construction Company as follows: "You are hereby requested to comply with the following changes from the contract plans and specifications." Next, the form provides a place for a description of the increases or decreases in the number of installed units different from the number of estimated units shown on the Bid Schedule. The final change order is designated Order No. 02–Final and includes the following adjustments to the contract:

| | | |
|---|---|---|
| Drainage Pipe Adjustments | $ 2,439.32 | increase |
| Surfacing Adjustments | $43,201.23 | increase |
| Traffic Control Adjustments | $ 245.70 | increase |
| Erosion Control Adjustments | $ 1,328.50 | decrease |
| Water Main Adjustments | $14,629.25 | increase |
| Sanitary Sewer Changes | $ 4,256.96 | decrease |

Total Adjustments $54,930.04 increase [5]

The form indicates the contract total of $1,002,601.15 including the changes. The Order is signed by the engineer. Attached to the form are five pages of detailed adjustments and narrative explanation for each category listed. Signature lines appear on the form as follows;

Requested _____
 *(Owner)*
Recommended _____
 *(Owner's Architect/Engineer)*
Accepted _____
 *(Contractor)*
Approved by Agency _____
 *(Name and Title)*

[¶ 23.] Sayre engineer Miller considered this a final change order designed to reconcile the final quantities which could not have been known until the project was completed. Miller testified that his interpretation of the contract provisions gave him the authority to approve certain changes on a day to day basis. He explained as follows:

> There's also language at the end of the proposal that deals with various quantity variations, too, that I think give the engineer as the owner's representative latitude in adding or deleting certain items of the project during the course of the work. And as we do that in the course of the work, we can't be dealing with a change order every time there's a deviation in the quantity.

During the project, Miller had submitted a change order to the City when a substandard slope in an existing sewer line was discovered and had to be remedied. The change order requested approval for work in the amount of $22,083.34. It was submitted and approved as part of Partial Payment Estimate 6. The first change order fell under the contract provision that specifically requires prior approval of a change order when unforeseen subsurface problems are discovered. Miller testified

that when the first change order was presented to the City, the City was told that the project may go over budget and that one way to stay within the budget was to eliminate the asphalt pavement on Warehouse Avenue. Miller said the City, "was pretty adamant that Warehouse Avenue would have to be paved. There was some discussion about it, but it was decided that Warehouse Avenue would be paved." A large portion of the increase in the project was attributable to Warehouse Avenue paving. Miller determined that prior approval was unnecessary for the final order because it merely adjusted the actual units used in the project; and as the owner's representative, he had approved the changes on a day to day basis. Miller testified that the Contractor, the City and RUS expected a final adjustment would be made after the project was completed since this was a unit bid contract.

[¶ 24.] The trial court determined that the contract required the City's prior approval of unanticipated conditions and granted summary judgment to the City. In its memorandum decision, the trial court stated:

> As a matter of law, the contract between Prunty and Canistota required notice of unanticipated conditions and a halt to the work until the change order was approved. The record before the Court indicates Prunty failed to comply with the requirements of the contract and thus Canistota is not bound to pay for these additional expenses.

Since interpretation of a contract is a matter of law, we review de novo "without any presumption in favor of the trial court's determination." *James River Equipment Co. v. Beadle Co. Equip., Inc.*, 2002 SD 61, ¶ 10, 646 N.W.2d 265 (citing *Thunderstik*

---

**5.** Prunty is also claiming an additional amount owed for aggregate in the amount of $4,498.52, which is not included in the final Change Order.

*Lodge, Inc. v. Reuer,* 1998 SD 110, ¶ 12, 585 N.W.2d 819, 822) (additional citations omitted); *Mahan v. Avera St. Luke's,* 2001 SD 9, ¶ 15, 621 N.W.2d 150, 154.

[¶ 25.] The only provision in the contract that specifically addresses the circumstances requiring prior approval and work stoppage is in the General Conditions 17.1.1 & .2. The specific provision requires the contractor to stop work when unanticipated conditions "differ[ ] materially" from the contract or "from those ordinarily encountered and generally recognized inherent" in this type of work. The conditions prompting the first change order fell within this provision. Whether any of the changes in the final change order fall within this provision is a question of fact. Some of the changes are reductions, some are increases. There is conflicting evidence of whether these changes were materially different from the contract or materially different from those ordinary and inherent conditions of sewer and water renovations. Whether the final change order falls under the contract provision requiring the work to stop until the City approves the order would be a question of fact.

[¶ 26.] Also inherent · in every contract is a covenant of good faith and fair dealing. *Mahan,* 2001 SD 9 at ¶ 30, 621 N.W.2d at 159. If the City did "adamantly require" the Contractor to pave Warehouse Avenue as Miller testified, it would be unreasonable for the City to disallow payment for the work. The trial court placed the entire burden of bringing forth a Change Order on the Contractor. The Contract, however, specifically gives the Owner the right to unilaterally make changes in the number of units. If the Owner makes changes without implement- · ing a written Change Order, it should not be allowed to deny payment for those changes for lack of a Change Order.

Since there are genuine issues of material fact, summary judgment is not appropriate. We reverse the trial court's grant of summary judgment in favor of the City.

*Final Order Part of Original Contract*

[¶ 27.] The City claims that even if the contract is a unit-price contract, that the City cannot be bound under South Dakota law governing municipalities. The City claims that the Final Order did not comply with SDCL 9–1–5 which requires the City to vote "at a duly assembled meeting." *Id.* The City further argues that the Final Order as a separate contract is void because it was not in writing and signed by the proper officials. SDCL 5–18–11, –19. The City's argument is without merit. The Change Order Prunty submitted was not a new contract. *Bak v. Jones County,* 87 S.D. 468, 470, 210 N.W.2d 65, 66 (1973) (holding that work performed for the county did not have to be compensated because one commissioner could not bind the county). It was a procedure for payment outlined in the original contract.

*City's Claim—Sanctions*

[¶ 28.] The City filed a motion for sanctions against Prunty pursuant to SDCL 15–6–56(g) which provides:

Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to 15–6–56 are *presented in bad faith* or solely for the *purpose of delay,* the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorneys fees, and any offending party or attorney may be adjudged guilty of contempt.

*Id.* (emphasis added). The trial court denied the motion. This Court has not previously addressed this provision. However, SDCL 15–6–11(a) (Rule 11) is similar to SDCL 15–6–56(g). Both statutes allow for imposition of sanctions for actions performed in bad faith or to cause delay. Rule 11 provides in part:

Every pleading, motion and other paper of a party ... [signed by an attorney] constitutes a certificate by him that he has read the pleading, motion and exhibits or attachments thereto, or other paper; that to the best of his knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is *warranted by* existing law or *a good faith argument* for the extension, modification or reversal of existing law, and that it is *not interposed* for any improper purpose, such as to harass, embarrass another party or person, or *to cause unnecessary delay* or needless increase in the cost of litigation.

SDCL 15–6–11(a) (emphasis added). If a violation of this rule occurs, the following provision provides for the imposition of sanctions:

If a pleading, motion, exhibits or attachments thereto, or other paper is signed or filed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed or filed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorneys fee.

SDCL 15–6–11(b). Rule 11 appeals are reviewed under an abuse of discretion standard. *Anderson v. Prod. Credit Assn.*, 482 N.W.2d 642, 645 (S.D.1992). "Abuse of discretion is discretion not justi-

fied by, and clearly against, reason and evidence." *Gronau v. Wuebker*, 2003 SD 116, ¶ 5, 670 N.W.2d 380, 382 (citation omitted). Similarly, we review sanctions under SDCL 15–6–56(g) under the abuse of discretion standard.

[¶ 29.] The trial court did not enter findings to support its denial of sanctions. The record, however, supports the trial court's denial of sanctions. The Complaint and Amended Complaint are both stated in broad terms allowing for different approaches to the claims. The City argues, however, that Prunty's affidavits assert contrary positions. Specifically, Prunty initially claimed that the adjustments were due to subsurface site conditions. Prunty's second affidavit, issued after the trial court granted the City summary judgment, states that the adjustments did not come "within the provisions of paragraph 17 of the General Conditions related to subsurface site conditions ... there were no site conditions existing within the intent or meaning of paragraph 17." Under the contract, not all site conditions come within the mandate of paragraph 17. Only such conditions that differed materially from those indicated in the contract or those ordinarily encountered and generally recognized in work of this character have to follow the work stoppage-prior approval procedure. Prunty claims that what it encountered at the sites was unknown prior to the work but nevertheless were conditions that were anticipated. The trial court did not abuse its discretion by denying the City's request for sanctions.

[¶ 30.] We reverse and remand in part, and affirm in part.

[¶ 31.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.